NEW RIVER LUMBER CO. *v.* TENNESSEE RY. CO. *et al.**

(*Knoxville.* September Term, 1921.)

1. **SPECIFIC PERFORMANCE.** Relief refused where contract is inequitable without pleading that issue.

The court must consider the entire situation and act on its discretion and will not specifically decree the performance of a contract shown to be harsh or inequitable, even though the pleadings did not raise that issue. (*Post, pp.* 282-284.)

2. **SPECIFIC PERFORMANCE.** Refused where contract is illegal without pleading that issue.

Specific performance of an unlawful contract will not be decreed whether the defense of illegality was specially pleaded or not. (*Post, pp.* 282-284.)

Acts cited and construed: Acts 1897, ch. 10.

Cases cited and distinguished: New River Lumber Co. v. Tenn. Ry. Co., 136 Tenn., 661.

Code cited and construed: Sec. 3059a (Thomp.).

3. **COURTS.** Decisions construing interstate Commerce Act are authoritative on construction of state act.

Acts 1897, chapter 10 (Thomp. Shan. Code, section 3059a et seq.), creating a Railroad Commission and defining its powers, was modeled after the Interstate Commerce Act of Congress, and practically all the decisions upon the construction of the federal statutes are authoritative upon the construction of the State act. (*Post, pp.* 284-288.)

Acts cited and construed: Acts 1897 ch. 10.

---

On effect of contracts fixing rates other than those established in accordance with interstate commerce act, see notes in 14 L. R. A. (N. S.), 400, and 38 L. R. A (N. S.), 351.

New River Lbr. Co. v. Tennessee Ry. Co.

Case cited and approved: L. W. Blinn Lbr. Co. v. So. P. Co., 18 Int. Com. Comm. R., 430.

4. **CARRIERS.** Contract fixing rate for definite period is superseded by new rate established under statute.

Even though a rate fixed by a contract for definite period between a carrier and a shipper is the legal rate at the time of the contract, a higher rate thereafter established by the carrier in accordance with the provisions of the Railroad Commission Law renders the contract ineffectual and would subject both the carrier and shipper to indictment if they adhere to the contract. (*Post, pp.* 288-290.)

Cases cited and approved: L. & N. R. Co. v. Mottley, 219 U. S., 467; So. Ry. Co. v. Linear, 138 Tenn., 543.

Cases cited and distinguished: Armour Packing Co. v. U. S. 209 U. S., 56; N. Y., N. H. & H. R. Co. v. Interstate Commerce Commission, 200 U. S., 361.

5. **CARRIERS.** Rate unlawful unless approved by the commission.

Under Acts 1897, chapter 10, section 22, concerning the Railroad Commission's powers over rates, no charge for transportation is lawful unless submitted to or fixed by the Commission, and no departure from the posted rates is lawful except as may be allowed by the Commission. (*Post, p.* 290.)

6. **EVIDENCE.** Carrier presumed to have filed tariff as required by law.

A carrier is presumed to have filed tariffs of the rates it is demanding from shippers as required by Railroad Commission Act of 1897. (*Post, pp.* 290-292.)

Acts cited and construed: Acts 1897, ch. 10, see 22.

Cases cited and approved: So. Ry. Co. v. Lewis & Adcock, 139 Tenn., 37; L. & N. R. Co. v. Hobbs, 136 Tenn., 512.

Case cited and distinguished: Cincinnati & T. P. R. Co. v. Rankin, 241, U. S., 319.

7. **EVIDENCE.** Carriers are quasi-public functionaries within presumption they do their duty.

New River Lbr. Co. v. Tennessee Ry. Co.

Common carriers are *quasi-public* functionaries, to which the presumption of law that they have complied with their legal duty in the absence of any proof to the contrary applies. (*Post, p.* 292.)

Cases cited and approved: East Tennessee, etc., R. Co. v. Gurley, 80 Tenn., 46; Railroad v. Duffield, 80 Tenn., 63; East Tenn., etc., R. Co. v. Stuart, 81 Tenn., 432; Railroad Co. v. Naive, 112 Tenn., 266.

8. CARRIERS. Special rates to encourage infant industries are illegal unless approved by Commission.

Special rates to encourage infant industries as permitted by Railroad Commission Act of 1897, c. 10, § 24, are legal only after they have been submitted to the Commission for revision, and only if they may be permitted without discrimination, so that no shipper and no carrier can make a special contract for special rates independently of the Commission. (*Post, pp.* 292, 293.)

Acts cited and construed: Acts 1897, ch. 10, see 24.

9. SPECIFIC PERFORMANCE. Not decreed where existence of legal contract is doubtful.

Where the legality of a contract between a carrier and shipper fixing rates for transportation is doubtful, specific performance thereof will not be enforced. (*Post, p.* 293.)

Case cited and approved: Morrison v. Searight, 63 Tenn., 476.

10. CONSTITUTIONAL LAW. Hardship does not justify judicial change of statute.

The hardship resulting to a shipper who had made large expenditures in reliance on a contract with a carrier fixing special rates does not authorize the court to read into the statutes regulating rates any exceptions not contained therein. (*Post, pp.* 293, 294.)

Acts cited and construed: Acts 1897, ch. 10, Acts 1915, ch. 92.

Cases cited and approved: Armour Packing Co v. United States, 153, Fed., 1.

11. SPECIFIC PERFORMANCE. Refusal to perform illegal provisions Does not authorize decree as to legal provisions not breached.

Specific performance of the legal portions of a contract between a

shipper and carrier will not be decreed where there was no breach of such obligations, though the carrier had refused to perform illegal provisions of the contract regulating rates. (*Post, pp.* 294, 295.)

12. **SPECIFIC PERFORMANCE.** Relief not granted where contract is terminable at will.

Equity will not decree specific performance where it may be nugatory, as where the contract may be terminated at the will of either party. (*Post, p.* 295.)

Cases cited and approved: Andrews v. Andrews, 28 Ala., 432; State v. Cadwailader, 172 Ind., 619; Alworth v. Seymour, 42 Minn., 526.

13. **SPECIFIC PERFCRMANCE.** Not decreed to enforce rates subject to change by Commission.

A court of equity will not decree specific performance of a contract fixing rates to be charged by a carrier, even though the rates therein specified are legal rates, since such rates would be subject to change at the order of the Commission. (*Post, pp.* 295, 296.)

14. **RECEIVERS.** Not appointed for railroad for which a receiver had been appointed in another suit.

In a suit by a shipper for specific performance of a contract with it by a carrier, receivers of the carrier will not be appointed to carry out certain provisions of the contract where, after the present suit was instituted, a receiver had been appointed for the same carrier in other proceedings in the same court, but the shipper's remedy must be sought in the court which appointed the receiver or with the permission of that court. (*Post, p.* 296.)

---

## FROM SCOTT.

---

Appeal from the Chancery Court of Scott County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. JOHN JENNINGS, Judge.

THOMPSON, WILLIAMS & THOMPSON, E. G. FOSTER, CHAS. T. CATES, JR., AND GEO. S. BAILEY, for appellant.

H. M. CARR, WRIGHT, JONES & SAXTON, FOWLER & FOWLER and JOUROLMON & WELCHER, for defendants.

MR. JUSTICE GREEN delivered the opinion of the Court.

In 1905 the New River Coal & Coke Company owned a large body of lands in Scott, Campbell, and Anderson counties, the timber on which was all sold to the New River Lumber Company of West Virginia.

The Tennessee Railway Company, a railroad corporation organized under the laws of Tennessee, was owned by the same interests that owned the New River Coal & Coke Company. The Tennessee Railway Company had under construction a line of railroad from Oneida, in Scott county, a station on the Cincinnati, New Orleans & Texas Pacific Railway. This road was being constructed in a southerly direction to the mouth of Paint Rock creek, a distance of about eleven miles, and the Tennessee Railway Company was proposing to extend this line into the lands of the New River Coal & Coke Company above mentioned.

On June 1, 1905, the New River Coal & Coke Company sold to the New River Lumber Company of West Virginia the timber and timber rights on the lands aforesaid. On the same day the New River Lumber Company of West Virginia and the Tennessee Railway Company entered into a contract which is the basis of the litigation herein and has been the basis of much previous litigation. The Cincinnati, New Orleans & Texas Pacific Railway Company was also a party to this contract.

The contract provided, among other things, that the Tennessee Railway Company would complete its line to the mouth of the Paint Rock creek and then extend the same through the lands heretofore referred to, a distance of about thirty-two miles, and would also construct twenty miles of lateral or branch tracks running off from the main line through certain parts of said lands.

The location and length of the laterals was prescribed and the general route of the main extension was set out, and the periods of time were stipulated during which these various extensions were to be made. Other obligations on the part of the Tennessee Railway Company were assumed which will be hereafter more particularly mentioned.

The New River Lumber Company of West Virginia on its part agreed to erect and equip a sawmill or sawmills upon its property sufficient to permit it to manufacture and ship ten million feet of lumber per annum within a fixed period after a stated portion of the extension of the railroad was made, and thereafter within a stated time agreed to manufacture and ship fifteen million feet of lumber per annum upon further extension of the railroad lines, and bound itself upon completion of the extension and laterals to manufacture and ship an average of twenty million feet of lumber per annum. All this lumber was to be shipped over the lines of the Tennessee Railway Company and of the Cincinnati, New Orleans & Texas Pacific Railway Company, so long as the rates of the latter were fair and reasonable, and not in excess of those given by other carriers.

This contract was to continue in effect for twenty-seven years from its date.

The Cincinnati, New Orleans & Texas Pacific Railway Company, in addition to assuming certain obligations under the contract, which will later appear, undertook to guarantee that the Tennessee Railway Company would construct the main line and lateral tracks as agreed therein.

The New River Lumber Company of West Virginia transferred its assets to the New River Lumber Company of Ohio. The latter corporation acquired the benefits and assumed the obligations of the contract before us.

On March 1, 1907, the Tennessee Railway Company executed a mortgage to the Standard Trust Company of New York upon all its property to secure an authorized issue of $4,500,000 of bonds. Of this authorized issue $1,300,000 were sold. The sawmills were erected and equipped by the New River Lumber Company of West Virginia and its successor, the New River Lumber Company of Ohio, as provided in the contract. This was done at a cost of about $2,000,000 to these lumber companies.

The Tennessee Railway Company started working on the extension and lateral tracks stipulated in the contract, but its funds gave out long before this work was completed. The New River Lumber Company (and hereafter by this name we mean the Ohio Corporation) filed a bill in the chancery court of Scott county July 1, 1913, in which it set out the contract above mentioned; that it had completed its mills at great expense and was prepared to comply with its undertakings. It showed that the Tennessee Railway Company had failed to complete its part of the contract, and that the complainant was sustaining great loss by reason of this default of the railway company, and it asked for a specific performance of said contract.

New River Lbr. Co. v. Tennessee Ry. Co.

On the same day, to-wit, July 1, 1913, the Tennessee Railway Company filed a bill in the chancery court of Scott county against the Standard Trust Company, the trustee under its mortgage, and other parties. The Tennessee Railway Company in this bill averred its insolvency, and the bill was filed as a general creditors' bill. It was stated therein that it would be to the advantage of the road to complete the extension and laterals so as to get the increased business from the lumber company, but that it was financially unable to do this work. A receiver was appointed for the Tennessee Railway Company. Upon his appointment the receiver was directed to issue sixty-five thousand dollars of receiver's certificates to go on with this extension work, and by subsequent decrees in the case other receiver's certificates were authorized and issued in an amount sufficient to complete the entire extension and laterals.

The two suits, the creditors' suit and the one brought by the New River Lumber Company, were consolidated. Thereafter the trustee under the mortgage came into the case and opposed the issuance of the receiver's certificates and the priority given to them. Many other pleadings were filed in the consolidated causes, various proceedings had, and orders entered, and an immense record built up.

These causes came to this court in a contest between the bondholders and the holders of the receiver's certificates as to priority of satisfaction out of the assets of the Tennessee Railway Company. All this appears, and the matter is more fully stated in *New River Lumber Co.* v. *Tennessee Railway Co. et al.*, 136 Tenn., 661, 191 S. W., 334.

The property of the Tennessee Railway Company was finally sold and bid in by J. N. Baker, trustee for a committee representing the holders of bonds and receiver's certificates. Baker operated the road for a while and thereafter turned it over to a new corporation that was brought out called the Tennessee Railroad Company, organized under the laws of this state.

Other facts will be stated as they become relevant in the course of the opinion.

In order to state the issues in the present litigation we must now revert to the contract of June 1, 1905, among the New River Lumber Company of West Virginia, the Tennessee Railway Company, and the Cincinnati, New Orleans & Texas Pacific Railway Company. This contract contained the following provisions:

"Second. The Tennessee Company agrees that from time to time as its track has been constructed as agreed it will haul and deliver logs from its main line and the laterals built by it, or built or extended by the lumber company, upon log cars of modern construction which it will furnish promptly in such numbers and at such times as may be required to keep the mills of the lumber company continuously supplied with logs from any point or points thereon to the mill or mills of the lumber company located on said lines, at a flat rate of four ($4.00) dollars per car of not less than thirty-four (34) feet in length and sixty thousand (60,000) pounds capacity, said cars to be promptly loaded and unloaded by the lumber company; also that it will haul all cordwood, bark and forest products on suitable cars of not less than forty thousand (40,000) pounds capacity at the same rate from the woods at points of loading on its lines to the mill or mills, factory

or factories, tannery or tanneries located by the lumber company on said lines, the said cars to be promptly loaded and unloaded by the lumber company; and also that the lumber company may attach its log loader to any log train of the Tennessee Company, which shall without charge, transport or transfer said loader to any other point on the lines of the Tennessee Company where and as said loader may be needed for the business of the lumber company, under the supervision of the proper officer of the Tennessee Company; and the lumber company shall also have a right to use its own engine to shift its log loader from point to point as its business may require upon the main and lateral lines of the road of the Tennessee Company under the supervision of the proper officer of that company, when such shifting shall, in the judgment of the lumber company, not be practicable by attaching said log loader to the log trains as hereinbefore provided, without, however, unreasonably interfering with the regular operation of the main or lateral lines by the Tennessee Company, and the lumber company shall be liable for any damage that may be done by its engine when upon the lines of the Tennessee Company.

"In consideration of the low rate agreed upon in this article second, the lumber company agrees that, after the completion of its first mill as hereinafter provided, the entire output of its mills, factories, tanneries, etc., derived from the products of the L. Bird lands which is shipped by railroad shall be shipped over the line of the Tennessee Company and the lines of the Cincinnati Company, so long as the rates from the point of origin to destination *via* said lines are as low as those given *via* any other line, and so long as the rate shall be fair and reasonable, and

the Tennessee Company shall furnish cars as they may be needed for the lumber company's business; and, in case of the lumber company's failure so to do, the Tennessee Company shall have the option of rescinding the agreement contained in this second article; provided always that the said Tennessee Company shall not at the time be in default in regard to the performance of any of its covenants or agreements in this contract contained.

"Third. The Tennessee Company and the Cincinnati Company agree to transport all cordwood lumber, staves, tanbark, and other articles included in the lumber list as carried in the lumber tariffs of the Cincinnati Company from points on the line of the Tennessee Company, as they now exist, or as they will exist after the above-mentioned extensions of thirty-two (32) miles of main track and twenty (20) miles of branch track, or any part thereof, shall have been constructed, at a through rate of fifteen (15) cents per hundred pounds from said points to the city of Cincinnati, Ohio.

"It is further agreed that, if the rates of transportation of said classes of freight from contiguous or competing territory shall at any time during the term of this contract be readjusted, the rate herein provided by this article third shall be subject to reasonable and relative readjustment, in order that the products shipped by the lumber company shall, so far as rates of the Tennessee Company and Cincinnati Company are concerned, be maintained in relatively a similar position in competing markets as under the rates herein provided for.

"It is further agreed that the rates for transportation of articles covered by the numbered and lettered classes, Southern classification, from Cincinnati, Ohio, Lexington,

Kentucky, and Harriman Junction and Chattanooga, Tennessee, destined to points on the lines of the Tennessee Company, shall be one hundred and thirty per cent. (130) of the class rates from Cincinnati, Lexington, Harriman Junction, and Chattanooga to Oneida, respectively, with the exception that on sawmill and coal-mining machinery in carload lots to be used in the erection of sawmills and the opening up and operation of coal mines situated on or so that their product may be shipped over the lines of the Tennessee Company, as they now exist, or as they will exist after said extensions, or any part thereof, shall have been made, rates not exceeding one-half of the above-mentioned one hundred and thirty (130) per cent. rates shall be charged and collected between above-mentioned points, but if a flat rate per car shall be made by the Cincinnati Company on its lines on any freight to be shipped over the line of the Tennessee Company to the lumber company the total rate to the lumber company shall not be more than one hundred and thirty (130) per cent. of said flat rate. The Tennessee Company and Cincinnati Company agree, so far as they legally can, to give the lumber company the half rate provided for in this paragraph for a period of five years from the date of this agreement.

"Fourth. The Tennessee Company further agrees that upon traffic originating on and destined to points on its lines the same rates shall be charged as would be charged for a similar distance as a local rate upon the line of the Cincinnati Company; also that shipments of any machinery, implements, materials, or supplies belonging exclusively to the lumber company between its stores, mills, factories, and camps, when both are within the boundaries

of the lands on which the lumber company shall be carrying on its operations, as herein contemplated, and carried upon log trains, shall be carried free, and the said lumber company, in consideration of such free transportation, hereby waives all right to make claim for loss or damage to freight carried free; also that employees of the lumber company may be carried free on such log trains as may be run, provided that the lumber company shall give to the Tennessee Company a guaranty against the payment of damages by reason of injury to or death of any such employees while so riding free.

"The Tennessee and Cincinnati Companies further agree to haul any coal or other mineral product shipped by the lumber company or which may be mined by the lumber company, or its lessees or licensees, or obtained from lands now owned or hereafter acquired by it over the lines of the Tennessee and Cincinnati Companies at the same rate or rates that are or may be charged to other shippers of coal or other mineral products over the lines of said companies for similar services performed under substantially similar circumstances and conditions, and at such times as the lumber company may reasonably require, and to transport all freight not hereinbefore provided for which the lumber company may desire to have shipped over their roads at rates that shall be reasonable and not in excess of rates charged to other shippers for similar service.

"Seventh. It is further agreed by the Tennessee Company that in any mortgage which it may create upon its said railroad hereinbefore described, it will insert the following clause after the *habendum* clause of such mortgage, namely:

" 'Subject, however, to, and this indenture is executed with notice of, the prior rights of the parties other than the Tennessee Company to a certain agreement between Tennessee Railway Company, the Cincinnati, New Orleans & Texas Pacific Railway Company, and New River Lumber Company, dated June 1, 1905, a copy of which is filed with the trustee herein named contemporaneously with the execution of this indenture; it being the intention of the Tennessee Company to bind its property in said agreement and of the parties thereto other than the Tennessee Company, which lien shall be, and hereby is, declared to be prior and superior to the lien of this indenture of mortgage.' "

Article 7 was put in the mortgage made.

After the property of the Tennessee Railway Company was bought in by J. N. Baker, trustee, he claimed that he was released from the obligations of sections 2, 3, and 4 of the contract by reason of certain provisions in the decrees of the court entered in the consolidated causes and by reason of other matters. In the bill in the present case the complainant, New River Lumber Company, after setting out a history of the previous dealings and litigations between the parties, charged that the said Baker had declined to furnish log cars of modern construction promptly, and in such manner and at such times as required by complainant at a flat rate of $4 per car, but was demanding a rate of $8 per car. It further charged that said Baker had declined and refused to haul cordwood, bark, and forest products of petitioner's on suitable cars at the same rate from the woods at points of loading to the mills of complainant; that said Baker refused to permit complainant to attach its log loader to the log trains op-

erated by him and haul the same free of charge; that said Baker had declined to permit complainant to use its own engine to shift its log loader from point to point under the supervision of the railroad officials; that said Baker had likewise refused to haul upon the log trains machinery, implements, materials, and supplies belonging exclusively to complainant between its stores, mills, factories, and camps within the boundaries of said lands free of charge; and that said Baker had refused to carry and transport the employees of complainant on said log trains free of charge. Complainant averred that it had been at all times willing and ready to comply with its obligations under the contract.

No special breach of its obligations under the contract of June 1, 1905, was charged against the Cincinnati, New Orleans & Texas Pacific Railway.

The bill in the present case was accordingly filed for a specific performance of the undertakings agreed to be performed by the Tennessee Railway Company and the Cincinnati, New Orleans & Texas Pacific Railway Company in articles 2, 3, and 4 of the aforesaid contract and to recover damages sustained by the complainant from said defendants incident to breaches of said contract. It was sought to hold the Cincinnati, New Orleans & Texas Pacific Railway Company as a guarantor of the obligations assumed by the Tennessee Railway Company. There was later a stipulation limiting any possible right of recovery against said guarantor.

Two amended and supplemental bills were filed by the complainant and the new corporation, the Tennessee Railroad Company, and others made defendants, and other charges brought forth.

New River Lbr. Co. v. Tennessee Ry. Co.

The various defendants named to the original and amended and supplemental bills interposed appropriate pleadings to raise defenses to which we shall refer. Proof was taken, and upon the hearing the chancellor dismissed the complainant's bills, and the court of civil appeals has affirmed this decree of the chancellor. The complainant's petition for *certiorari* has been granted, and the case elaborately briefed and argued in this court. The questions made here are virtually the same as those made in the lower courts.

Speaking generally, the complainant contends that upon the faith of the contract of June 1, 1905, it has gone to great labor and expense to develop its property; that it has erected large mills, built a town for its employees, completed an organization of its forces, and perfected a large plant—all at a cost of about $2,000,000. It insists that it is entitled to have all the terms of the contract of June 1, 1905, specifically enforced in its favor. It contends that this proposition was so adjudicated by the decrees in the consolidated cases, and that the present owners of the railroad bought said property under such decrees burdened with this obligation. Complainant further urges that, regardless of any former adjudication, the obligations imposed on the Tennessee Railway Company in the contract of June 1, 1905, and referred to in the trust deed executed to secure the issue of bonds were covenants which ran with the railroad property, and are binding on any owner thereof. If mistaken as to this complainant says that these obligations were made charges on the railroad property and a lien fixed on said property to secure their performance by valid contract, and that the present owners acquired said property with full knowledge of said charges

and obligations resting thereon, and must be required by a court of equity to observe them. Complainant attacks the reorganization plan of the bondholders and holders of receiver's certificates as a fraud upon its rights, and as being unlawful.

Defendants challenge all these contentions. They say that the decrees in the consolidated cases only directed the specific performance of the original contract in so far as that contract provided for the extension of the railroad lines and lateral tracks; that the obligations contained in articles 2, 3, and 4 of the contract were not covenants which ran with the property or land; that they were not covenants which the purchasers and present owners of the railroad property were bound to respect or are bound to respect; that, on the contrary, the decree of sale expressly freed the property in the hands of purchasers from such obligations. The defendants also insist that, regardless of everything else, this is not a case for specific performance, because the execution of the provisions of articles 2, 3, and 4 of the contract would be harsh and inequitable. They further say that the said provisions of said articles cannot be enforced against any ohe because contrary to law.

It is suggested that defendants cannot rely on any harsh or inequitable or unlawful feature of that portion of the contract here sought to be enforced, since the pleadings are not sufficient to raise these questions. Where specific performance, however, is sought, the court must consider the entire situation and act on its discretion. The court could not specifically decree the performance of any contract which was shown to be harsh or inequitable or unlawful upon the record before it. Certainly the court could not

decree the performance of an unlawful contract, whether the defense of illegality was specifically pleaded or not; for, whenever the illegality is made to appear, it is the duty of the court to refuse to entertain the action. 25 R. C. L. 334.

The first defense relied on in this court is that articles 2, 3, and 4 of the contract of June 1, 1905, cannot be specifically enforced because they embody an undertaking to do things prohibited by law.

We think this defense must be sustained. If former decrees in the consolidated cases can be treated as directing a specific performance of such things, these decrees are in our opinion to that extent nugatory.

Railroad transportation charges have been by statutes, State and federal, virtually removed from the domain of contract, and have become matters to be regulated alone by the law.

Chapter 10 of the Acts of 1897, carried into Thompson's Code at section 3059a et seq., controls this controversy. The scope of this statute is indicated by its title, which is as follows:

"An act to create a Railroad Commission in this State and define its duties and powers; to prohibit extortion, unjust discrimination and undue or unreasonable preferences by railroad companies and other persons operating railroads in this State, in their charges for the transportation of freight and passengers; to secure just and reasonable rates and charges for all such services; and to impose penalties and to provide adequate civil remedies for, and punish violations of, this act, and to secure the due execution and enforcement of its provisions and all lawful

orders, rules and regulations of the said Railroad Commission.

Our statute was modeled after the federal act of February 4, 1887 (24 Stat. 379). That statute was supplemented by others notably the Elkins Act of 1903 (U. S. Comp. St., sections 8597-8599), which made the original law more explicit and made shippers criminally responsible for its violation. The general purpose of the first Interstate Commerce Act of 1887, identical with the general purpose in our act of 1897, has all the while been preserved in congressional legislation, and practically all the decisions upon the construction of the federal statutes are authoritative upon the construction of ours.

The sections of chapter 10 of the Tennessee act of 1897 pertinent to this inquiry, each of which has its prototype in the Interstate Commerce Act of 1887, are the following:

"Sec. 14. That all railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared subject to the provisions of this act, and all individuals, companies, corporations, trustees, receivers, and lessees owning, operating and managing such railways for the transportation of freight and passengers, are hereby declared common carriers.

"Sec. 15. That if any such common carrier shall directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person or persons, firm or corporation, a greater or less compensation for any services rendered in the transportation of any kind of property upon such railroads within this State than it charges, demands, collects or receives from any other person or persons, firms or corporations for doing for him or them a like service in the transporta-

tion of a like kind of property under substantially like circumstances and conditions, and if such common carriers make any preference between the parties aforesaid, in furnishing cars or motive power for the purpose aforesaid, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared unlawful. . . .

"Sec. 17. That it shall be unlawful for any corporation to make or give any undue or unreasonable preference or advantage to any particular person or locality, or any particular description of traffic, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage. . . .

"Sec. 22. That it shall be the duty of all persons or corporations who shall own or operate a railroad in this State, within thirty days after the passage of this act, to furnish the commission with its tariff of charges for transportation of every kind, and it shall be the duty of said Commission to revise said tariff charges so furnished, and determine whether or not, and in what particular, if any, said charges are more than just compensation for the service to be rendered, and whether or not unjust discrimination is made in such tariff of charges against any person, locality or corporation, and when such charges are corrected, as provided by said Commission, the Commission shall then append a certificate of its approval to said tariff of charges; but in revising or establishing any and every tariff of charges, it shall be the duty of said Commission to take into consideration the character and nature of the service to be performed and the entire business of such railroad, together with its earnings from the passenger and other

traffic, and any other facts and circumstances which may affect the question of just and reasonable rates, and shall so revise such tariffs as to allow a fair and just compensation, having due regard to the rights and interests of both shipper and carrier, and in view of all the circumstances and conditions existing at the time; and it shall be the duty of said Commission to exercise a careful and watchful supervision over every such tariff of charges from time to time as justice to the public and each of said railroads may require, and to increase or reduce any of said rates according as experience and business operations may show to be just; and said Commission shall accordingly fix the tariffs of charges for these railroads failing to furnish tariff of charges as above required. And it shall be the duty of said railroad companies or other persons operating any railroad in this State, to post, at each of its depots all rates, schedules, and tariffs for the transportation of passengers and freights, made or approved by said Railroad Commission, with said certificate of approval, in some conspicuous place at the depot, and it shall be unlawful for any such person or corporation to make any rebate or reduction from such tariffs in favor of any person, locality or corporation, which shall not be made in favor of all other persons, localities or corporations by a change in such published rates, except as may be allowed by the Commission; and when any change is contemplated to be made in the schedule of passenger or freight rates of any railroad by the Commission, whether by revising rates already fixed by the Railroad Commission or by fixing and establishing rates originally. Said Commission shall give the person or corporation operating or managing said railroad notice in writing at least ten days before the change,

of the time and place at which such change will be considered.   .   .   .

"Sec. 24. That this act shall not prevent any railroad company from transporting freight free of charge, or at reduced rates, for any religious, charitable, or benevolent purpose, or for any industrial exposition, fair or association of a public nature, or for transporting immigrants into this State, or persons prospecting with a view of locating or bringing immigrants into this State, or for pleasure excursions. However, nothing in this act shall be construed so as to prevent the railroads of this State from giving special rates to encourage infant manufacturing industries, and for the encouragement of any other new business or industry, or for the transportation of any perishable goods.

"Provided, that such transportation shall be furnished without discrimination, and under such rules and regulations as the Commission may prescribe."

In considering these provisions, we may with propriety quote an expression of the Interstate Commerce Commission:

"The theory of the common law permitted carriers to make private contracts for transportation, which contracts were evidenced by the bills of lading given to the shippers. Under this practice, charges varied as between shippers, and the fullest freedom was exercised to 'trade' in transportation. The abuses arising under such conditions led to the enactment of the act to regulate commerce. Thenceforth the rates to be charged for transportation were removed from the field of barter and became matters of legal regulation. The bill of lading became at once little more than a receipt for the goods to be transported, into which

could be legally incorporated nothing obnoxious to the law. It was therefore placed beyond the power of the agent of a corporation carrier, or any other officer thereof, to bind the carrier to any rate other than that applicable under the filed tariffs, to the traffic accepted for transportation. This is necessarily so, else the purpose of the law could be set aside at will by any agent who might choose to favor or to injure a shipper. The shipper obtains transportation by right of law, and the rate charged is not the result of contract, but is fixed and determined under a required legal form." *L. W. Blinn Lumber Co.* v. *Southern P. Co.,* 18 Interst. Com. Comn. R. 430.

Although a contract for a fixed period be entered into between a carrier and shipper for a freight rate, which is the legal rate at the time of the contract, yet, if thereafter the carrier establishes a higher rate in accordance with the provisions of the law, the contract is ineffectual. Indeed both carrier and shipper would be indictable if they adhered to the contract.

"There is no provision excepting special contracts from the operation of the law. One rate is to be charged, and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers, and no method of making them public defined in the statute. If the rates are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart. It is said that, if the carrier saw fit to change the published rate by contract, the effect will be to make the rate available to all other shippers. But the law is not

limited to giving equal rates by indirect and uncertain methods. It has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be, while in force, the only legal rate. Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish. . . . The statute, being within the constitutional power of Congress, and being in force when the contract was made, is read into the contract and becomes a part of it. If the shipper sees fit to make a contract covering a def-- inite period for a rate in force at the time, he must be taken to have done so subject to the possible change of the published rate in the matter fixed by statute, to which he must conform or suffer the penalty fixed by law." *Armour Packing Co.* v. *United States,* 209 U. S. 56, 28 Sup. Ct., 428, 52 L. Ed., 681.

In another case the supreme court of the United States said: "It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination." *N. Y., N. H. & H. R. Co.* v. *Interstate Commerce Commission,* 200 U. S. 361, 26 Sup. Ct., 272, 50 L. Ed., 515.

See, also, to the same effect, *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S., 467, 31 Sup. Ct., 265, 55 L. Ed., 297, 34 L. R. A. (N. S.), 671; *Southern Railway Co.* v.

*Linear,* 138 Tenn., 543, 198 S. W., 887, L. R. A., 1918B, 1114.

Section 22 of chapter 10 of the Acts of 1897, above quoted, provides that it shall be the duty of all persons or corporations who own or operate a railroad in this State to furnish the Railroad Commission with its tariffs of charges "for transportation of every kind." The Commission must examine the proposed charges and revise them if necessary. When approved by the Commission, it is the duty of the railroad company or other person operating the railroad to post at each of its depots all rates and tariffs for the transportation of freight and passengers approved by the Commission; "and it shall be unlawful for any such person or corporation to make any rebate or reduction from such tariffs in favor of any person, locality or corporation, which shall not be made in favor of all other persons, localities or corporations by a change in such published rates, except as may be allowed by the Commission."

That is to say, no charge for transportation is a lawful charge unless submitted to or fixed by the Commission, and no departure from the posted rates is lawful "except as may be allowed by the Commission."

It does not appear that the Tennessee Railroad Company has filed its schedule of tariffs. The record does show, however, that it demanded $8 a car for hauling logs instead of $4 a car, as provided in the contract, and that it refused to render other services on the contract basis.

The presumption is that the Tennessee Railroad Company has duly filed its tariffs, and that the compensation which it now demands for hauling logs and for other services is the lawful charge. Obedience on the part of rail-

road companies to the requirements of the act of 1897 is exacted under severe penalties by sections 18, 19, 23, and 25 of the act. This identical question came before the supreme court of the United States in a case going from this State. The trial court here held that the burden of proof was on a railroad company to show that it had complied with the provisions of the Interstate Commerce Acts. This ruling was affirmed by the court of civil appeals. This court affirmed the judgment of the court of civil appeals for some reason without opinion.

The supreme court of the United States, when the case reached that tribunal, reversed and remanded, and said:

"We cannot assent to the theory apparently adopted below that the interpretation and effect of a bill of lading issued by a railroad in connection with an interstate shipment present no federal question unless there is affirmative proof showing actual compliance with the interstate commerce act. It cannot be assumed, merely because the contrary has not been established by proof, that an interstate carrier is conducting its affairs in violation of law. Such a carrier must comply with strict requirements of the federal statutes or become subject to heavy penalties, and in respect of transactions in the ordinary course of business it is entitled to the presumption of right conduct. The law 'presumes that every man, in his private and official character, does his duty, until the contrary is provided; it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption, according to the maxim, '*Omnia presumuntur rite et solemniter esse acta, donec probeturin contrarium.*'" *Cincinnati & T. P. R. Co.* v. *Rankin*, 241 U. S., 319, 36 Sup. Ct., 555, 60 L. Ed., 1022, L. R. A., 1917A, 265.

Later we applied this presumption in favor of the carrier in *Southern Ry. Co.* v. *Lewis & Adcock,* 139 Tenn., 37, 201 S. W., 137, L. R. A., 1918C, 976. The same presumption was applied by this court in *Louisville & Nashville R. Co.* v. *Hobbs,* 136 Tenn., 512, 190 S. W., 461, and that case cited to this effect in *Southern Railway Co.* v. *Lewis & Adcock, supra.* The published opinion in *Louisville & Nashville R. Co.* v. *Hobbs, supra,* however, was revised before it was printed, and as reported does not notice this question.

Earlier cases in Tennessee have frequently applied to railroad companies the presumption that they have complied with their legal duty in the absence of any proof to the contrary. *East Tennessee, etc., R. Co.* v. *Gurley,* 12 Lea (80 Tenn.), 46; *Railroad* v. *Duffield,* 12 Lea (80 Tenn.), 63, 47 Am. Rep., 319; *East Tennessee, etc., Railroad Co.* v. *Stewart,* 13 Lea (81 Tenn.), 432. In *Railroad Co.* v. *Naive,* 112 Tenn., 266, 79 S. W., 124, 64 L. R. A., 443, the presumption was employed; it being said in this connection that common carriers were *quasi*-public functionaries. As to such characters the presumption of law embodied in the Latin maxim quoted by the supreme court above is of particular force. Broom's Legal Maxims, *944.

As a matter of fact it is conceded on the briefs of complainant that the rates and services stipulated in the contract and sought to be here enforced are special. An argument is made to justify them under section 24 of the act of 1897, which is to the effect that special concessions may be made, among other things, to encourage infant manufacturing industries and other new industries. These concessions, however, are permissible under a proviso "that such transportation shall be furnished without discrimina-

tion and under such rules and regulations as the Commission may prescribe."

Any such special rate, therefore, must be submitted to the Commission for revision, and then it may only be allowed without discrimination. No shipper and no ,carrier can make a special contract for special rates independently of the Commission. A special rate, like the general rate, can only be established under supervision of the Commission and for reasons obviously stronger. There is no pretense of any authority of the Commission for the concessions granted to complainant under the contract of June 1, 1905.

If the rates and services undertaken by the Tennessee Railway Company in sections 2, 3, and 4 of the contract before us are special or discriminatory and unauthorized by the Commission, and, as we have seen, they must be so considered, then those provisions of the contract are unlawful. Specific performance of illegal contracts will not be decreed by a court of equity. 36 Cyc., 546, and cases cited. Nor does an action for damages lie for redress of the breach of such contracts.

In this State, if doubt is thrown upon the existence of a legal contract, specific performance thereof will not be enforced. *Morrison* v. *Searight,* 4 Baxt. (63 Tenn.), 476.

All the obligations assumed by the railroad companies in sections 2, 3, and 4 of the contract of June 1, 1905, which the proof indicates have been repudiated, relate to transportation, and no such special contracts are permissible. No devices which unevenly affect rates can be upheld.

Much has been said about the hardship that will be imposed upon the complainant by a refusal of the court to decree the specific performance of those articles of the

contract here in controversy. It is said that the complainant has gone to great expense in acquiring its property and completing its plant on the faith of the rates and services secured to it under said contract, and that the charges proposed to be exacted from it by the Tennessee Railroad Company will force complainant into bankruptcy.

Many of the cases in which special contracts have been considered by this court and the supreme court of the United States were cases of hardship. The statutes, however, are comprehensive and imperative in their terms and the courts have not felt authorized to read into them any exceptions that they themselves did not contain. *Armour Packing Co.* v. *United States,* 153 Fed., 1, 82 C. C. A., 135, 14 L. R. A. (N. S.), 400; *Louisville & Nashville R. Co.* v. *Mottley,* supra; *Southern Railway Co.* v. *Linear,* supra.

We think the apprehensions of complainant are not well founded. The Railroad Commission has full authority in the premises (chapter 10, Acts 1897; chapter 92, Acts of 1915), and upon a proper showing will fix rates just to all parties that will meet the equities of the situation.

So far as the Cincinnati, New Orleans & Texas Pacific Railway Company is concerned, the transportation services which it agreed to perform under articles 2, 3, and 4 of the contract are interstate in their character, and we cannot decree these things to be done because of the federal statutes.

Sections 2, 3, and 4 of the contract contain some agreements that are valid and enforceable. If separated from other things therein, these valid obligations, however, are mostly obligations imposed by law regardless of any contract. At any rate, no breach of such obligations has been proven, and specific performance of a contract will not

New River Lbr. Co. v. Tennessee Ry. Co.

be undertaken prior to a breach. 36 Cyc., 778; 20 Enc. Plead. & Prac.; 457.

Since the covenants of the old contract shown to have been breached, and here sought to be enforced, are in our opinion invalid, it is not necessary to consider whether they would otherwise run with the land or be binding on the present owners of the Tennessee Railway Company's property.

Aside from all the foregoing, the principal object of the present litigation is to enforce a contract for freight rates and services in connection therewith for a long period of time. In our opinion a court of equity could not undertake to decree specific performance of such a contract under well-settled principles.

The court will not make any decree in any matter which will be nugatory. 36 Cyc., 576. For instance, a court will not undertake to enforce a voluntary postnuptial agreement by a husband to make a settlement on his wife, since it is revocable until it is executed. *Andrews* v. *Andrews*, 28 Ala., 432. It will not decree specific performance of a contract which either party may abandon at will. *State* v. *Cadwallader* (1909), 172 Ind., 619, 87 N. E., 644, 89 N. E., 319. It will not decree the performance of a contract of agency which may be terminated at any time by action of one of the parties. *Alworth* v. *Seymour,* 42 Minn., 526, 44 N. W., 1030. Other illustrations are referred to in cases contained in note 17, 36 Cyc., 576.

Of transportation charges of railroad companies within the State the Railroad Commission has complete jurisdiction. The Commission may fix and alter these charges within its discretion, short of confiscation or extortion. Even though a contract for freight rates should stipulate the legal rate, such a rate would be subject to change, as

we have heretofore seen, at the order of the Commission. The chancery court, therefore, could make no decree enforcing a contract for rates that would not be subject to be defeated by the action of the Railroad Commission. The court should not undertake anything beyond its power. It should no more undertake the enforcement of a contract subject to be superseded by the act of a Commission than enforcement of a contract subject to be abandoned at the wish of one of the parties thereto. In other words, a decree for specific enforcement of a rate contract for a fixed period of time is beyond the jurisdiction of the chancery court. For this reason, we have heretofore said that, if former decrees in the old consolidated cases undertook to enforce all the provisions of the contract of June 1, 1905, such decrees were nugatory to this extent.

An application was made on the hearing of this case for a receiver for the Tennessee Railroad Company, it being charged that it was in default about furnishing sufficient log cars to the complainant and in other matters, and was threatening to remove the log cars formerly used in this service. Subsequently, as appears from a brief of counsel, in other proceedings in the chancery court of Scott county a receiver has been appointed for the Tennessee Railroad Company. This appearing, complainant's remedy along these lines must be sought in the court which appointed the present receiver or with permission of that court. We do not think upon this record that we have jurisdiction of the property of the Tennessee Railroad Company in this cause, as distinguished from jurisdiction of the parties owning said property.

From all the foregoing it results that the decree of the court of civil appeals must be affirmed. The motion for a receiver and injunction is likewise overruled.