FALMOUTH CO-OPERATIVE MARKETING ASS'N *v.* PENNSYLVANIA RAILROAD CO.

1. COMMERCE—INTERSTATE COMMERCE ACT—EXPRESS CONTRACT TO FURNISH CARS ILLEGAL.

Under the interstate commerce act, which seeks to enforce tariff provisions and provide equal treatment for all shippers, an express contract to furnish cars for shipment of goods is illegal as a special privilege, and therefore in an action for damages based on an express contract the trial court was in error in refusing to give a requested instruction of no cause of action.[1]

2. CARRIERS—RAILROADS—LIABILITY OF RAILROAD FOR FAILURE TO NOTIFY SHIPPER OF INABILITY TO FURNISH CARS.

Where a shipper relied upon the promise of a railroad company to furnish cars, and it not only failed to furnish them but also failed to notify him of its inability to do so, and loss therefrom resulted to the shipper, although the company is not liable on its express contract because void under the interstate commerce act, it is liable for its failure to timely notify the shipper of its inability to furnish the cars.[2]

[1]Carriers, 10 C. J. §§ 71 (Anno), 763; [2]Id., 10 C. J. § 67 (Anno).

3. DAMAGES—EVIDENCE—MARKET PRICE AT NEAREST MARKET MAY
BE SHOWN WHERE NO MARKET AT SHIPPING POINT.
In an action by a shipper for damages to potatoes stored
in his warehouses, caused by failure of defendant to fur-
nish cars for shipment, on the question of damages, where
it was shown that there was no market at the shipping
point, it was permissible to show the market price at
the nearest market.[3]

Error to Wexford; Lamb (Fred S.), J.    Submitted
June 12, 1925.    (Docket No. 23.)    Decided October
27, 1925.

Case by the Falmouth Co-operative Marketing
Association against the Pennsylvania Railroad Com-
pany for failure to furnish cars.    Judgment for
plaintiff.    Defendant brings error.    Reversed.

*Henry Miltner* and *Knappen, Uhl & Bryant,* for ap-
pellant.

*A. W. Penny* and *A. J. Engel,* for appellee.

BIRD, J.    Plaintiff is a co-operative marketing
association, composed of 300 members.    It does busi-
ness at Falmouth, where it has three large warehouses.
Falmouth is situate on one of defendant's branch lines,
and has only one railway.    In the fall of 1922 plain-
tiff could not get cars, as agreed, to move to market
the potatoes it had purchased, and brought this suit
to recover its damage.    The jury awarded plaintiff
$15,379.59.

Falmouth and vicinity appears to be engaged largely
in potato raising, and for several years plaintiff has
purchased and shipped large quantities to market
over defendant's line.    In August, 1922, the station
agent of defendant at Falmouth inquired of plaintiff
as to the prospects of the crop for that year and he
was told it was about the same as 1920 and 1921.

---

[3]Carriers, 10 C. J. § 76 (Anno).

He was told that plaintiff would need 150 cars, beginning with the 1st of October. The station agent said his line could furnish the usual number of cars, and that it would furnish them. Later when the bins in their warehouses were filled with potatoes they hesitated about filling their alleys, but finally did so, relying upon the express promise of the agent to furnish cars promptly to empty them. When the time came for furnishing the cars only a few of the number promised were delivered, resulting in a great loss to the plaintiff. Plaintiff's declaration counted upon this express promise of the station agent. There was also a count based upon defendant's common-law and statutory duty to furnish equipment, and one count based upon its common-law duty and rule of distribution without discrimination.

The defendant insisted that, under its *pro rata* rule for the distribution of cars, Falmouth received its full quota, and that it could not deliver more to them without discriminating against other shippers; that it was likewise prevented from delivering to it all of the cars plaintiff needed because it demanded refrigerator cars, and owing to strike conditions and congestion of traffic and the use of said refrigerator cars by other railroads it was unable to furnish the number demanded. And it further insisted in its defense that it was prevented from furnishing more cars by reason of the depth of the snow on its branch line.

At the conclusion of the evidence the trial court was requested by defendant to charge:

"I charge you that plaintiff admits that cause of the damage to the potatoes was the placing of potatoes in the alleys of its warehouse, but claims that it placed the potatoes in the alleys relying on an express promise of the defendant to furnish cars. I further charge you that if such an express promise was made by defendant it was illegal and plaintiff had no right to

rely thereon, and your verdict must be no cause of action."

This was denied and the jury were instructed that:

"If you find that such an agreement was made for cars as claimed by the plaintiff, then the inability of the defendant to furnish such cars, due to car shortage, or an unusual demand for cars which the defendant could not have reasonably foreseen, or being unable to furnish cars because of an unusual, sudden and unexpected press of business, or because of snow and ice on its tracks, or on account of strikes, would constitute no defense to such a promise absolute and unconditional in its character."

The court's refusal of this request raises the important question in the case.    Plaintiff insists that the case is controlled by *Eastern Railway Co.* v. *Littlefield*, 237 U. S. 140 (35 Sup. Ct. 489).    In this case the plaintiff was a dealer in cattle.    In May he advised the station agent that he would need 200 cars in September and October, and he would like to have them delivered in lots of 50. When the time came for delivery the company failed to deliver the cars, and the 3,900 head of cattle had to be driven back 100 miles to the ranch at a great loss.    The defense sought to avoid responsibility by showing there was an unusual demand for transportation facilities, and that it could not furnish the cars without discriminating against other shippers. Mr. Justice Lamar, in determining the question, said in part:

"But whatever may be the rights and remedies of the parties and the jurisdiction of the commission in such cases, it is certain that the defendants' answer does not meet the issue nor set out facts which would constitute a defense against the cause of action alleged in the plaintiffs' pleading.    For the answer indicates that the car shortage was known to the carriers when the plaintiffs demanded cars to be furnished in September and October.    There is no allegation that in

May the carrier objected that the demand was unreasonable in the time that it was made or in the number of cars that were demanded.   Nor was there any claim that the want of equipment was brought to the attention of the cattle company, or that it was notified that conditions were such as to make it impossible for the carriers to agree to furnish cars at the time and place designated.   If such information had then been given to the shipper, or promptly upon subsequent discovery that the defendants would be unable to supply the cars, a different question would have arisen.   But where, without fault on its part, a carrier is unable to perform a service due and demanded, it must promptly notify the shipper of its inability, otherwise the reception of goods without such notice will estop the carrier from setting up what would otherwise have been a sufficient excuse for refusing to accept the goods or for delay in shipment after they had been received.   The evidence is not set out in the record and there are no findings of fact, but the verdict of the jury must be construed to mean that the evidence sustained the material allegations of the complaint and showed that the defendants had negligently failed to furnish cars promised.

"Thus construed, it appears that the plaintiff in May gave the carriers notice that it would need 200 cars in the following September and October to be used in the shipment of cattle from Texas to Missouri.   The offer was accepted and a statement was made that the cars would be on hand at the time and place named.   Relying thereon the cattle company drove its herd a long distance across the country and at great expense kept them at the station until definitely notified that they could not be shipped for several weeks.   In the meantime great expense had accrued, the market was lost and the cattle had to be driven 100 miles back to the ranch.

"The liability of the carriers under these facts, and in the absence of a showing of new facts establishing an excuse, became fixed when the cattle were tendered for shipment and the carrier failed to furnish the facilities needed.   That liability cannot now be avoided by proof that the failure to furnish cars was occasioned by a shortage for which the carriers may

not have been responsible but as to which they failed to give timely notice to the shipper.

"The question as to whether at common law these railroads were liable as forwarders of freight to be delivered to connecting carriers outside the State; and whether the railways were so associated as to make them jointly and severally liable are matters concluded by the decision of the supreme court of Texas.    There is no merit in the Federal question relied on and the writ of error is dismissed."

On the other hand the defendant relies upon *Davis* v. *Cornwell,* 264 U. S. 560 (44 Sup. Ct. 410).    In this case an express contract to furnish cars was relied upon for a recovery.    It was shown that Cornwell ordered of the station agent empty cars to be ready October 2, 1918, for loading with cattle to be transported in interstate commerce.    It was held that the contract provided for a special privilege in violation of the interstate commerce act, and could not be sustained.    Mr. Justice Brandeis, who delivered the opinion, said, in part:

"Whether, under the interstate commerce act as amended, the express promise to furnish cars was valid is the only question requiring decision.

"The transportation service to be performed was that of common carrier under published tariffs, not a special service under a special contract, as in *Chicago, etc., R. Co.* v. *Maucher,* 248 U. S. 359 (39 Sup. Ct. 108).    The agent's promise that the cars would be available on the day named was introduced to establish an absolute obligation to supply the cars, not as evidence that the shipper had given due notice of the time when the cars would be needed, or as evidence that the carrier had not made reasonable efforts to supply the cars.    The obligation of the common carrier implied in the tariff is to use diligence to provide, upon reasonable notice, cars for loading at the time desired.    A contract to furnish cars on a day certain imposes a greater obligation than that implied in the tariff.    For, under the contract, proof of due diligence would not excuse failure to perform.

"*Chicago, etc., R. Co.* v. *Kirby*, 225 U. S. 155 (32 Sup. Ct. 648, Ann. Cas. 1914A, 501), settled that a special contract to transport a car by a particular train, or on a particular day, is illegal, when not provided for in the tariff. That the thing contracted for in this case was a service preliminary to the loading is not a difference of legal significance. The contract to supply cars for loading on a day named provides for a special advantage to the particular shipper, as much as a contract to expedite the cars when loaded. It was not necessary to prove that a preference resulted in fact. The assumption by the carrier of the additional obligation was necessarily a preference. The objection is not only lack of authority in the station agent. The paramount requirement that tariff provisions be strictly adhered to, so that shippers may receive equal treatment, presents an insuperable obstacle to recovery."

The facts in the first case cited are very similar to those in this case, but it will be noticed in that case no express contract was relied upon. The plaintiff disclosed his needs to the agent and the agent said he would furnish the cars. The defense which the company sought to make was not overruled because of an express promise to furnish cars, but because, after the railway found it could not deliver them, as promised, it did not notify the plaintiff. Plaintiff in this case would have been in the identical position that plaintiff in that case was in had it eliminated the count on the express contract. It was shown in the present case that the station agent was advised of plaintiff's needs, and the agent promised to furnish the cars, and did not notify the plaintiff when it learned that it could not do so. Plaintiff was permitted to recover in the first case cited because the defendant was notified of plaintiff's needs, and promised to supply them, and was estopped to show that it had used due diligence when the cattle were tendered for shipment. No recovery was had upon express contract.

The second case cited by defendant was based wholly upon an express contract to deliver cars on a certain date.    Here we have the question passed on whether a carrier can make a contract which may not be avoided by a showing of due diligence on its part. This opinion does not mince the matter.    It holds squarely that an express provision to deliver a car for loading on a particular day could not be enforced because it is a special privilege.    If it were held that it could be enforced it would be in collision with the interstate commerce act which seeks to enforce tariff provisions and provide equal treatment for all shippers.    It is quite evident that either the contract or the interstate commerce act must give way.    If railroads were excused from following the provisions of the interstate commerce act by a contract which they had made in violation of the act, the act would have little force in enforcing tariff provisions and equal opportunity for all shippers.    Inasmuch as congress has sole power over interstate shipments it is paramount and its authority must be recognized. Our conclusion is that the request proffered by defendant should have been given, and the court's refusal is reversible error.

As a retrial will doubtless take place, another question raised by defendant should be noticed.    On the question of damages the trial court permitted plaintiff to show there was no market for the potatoes at Falmouth and to show the price at Cadillac, its nearest market.    Defendant says the market price at Falmouth should govern.    We have held that where there was no market price at the point of shipment, recourse might be had to the nearest market.    *Piowaty* v. *Sheldon,* 167 Mich. 227 (Ann. Cas. 1913A, 610) ; *Saginaw Milling Co.* v. *Schram,* 198 Mich. 773; 8 R. C. L. p. 489.    Or the jury might have considered its actual value.    *Close* v. *Railroad Co.,* 169 Mich. 392.    In this

232—Mich.—35.

case we think it was proper to show what the market price was at Cadillac, that being the nearest market. This rule of damages appears to be in accord with *Richey & Gilbert Co.* v. *Railway Co.*, 110 Minn. 347 (125 N. W. 897), which the defendant cites as the proper rule of damages in such cases. We think the court made no error in this respect.

For the error pointed out the case will be reversed and a new trial granted. Defendant will recover its costs in this court.

McDONALD, C. J., and CLARK, SHARPE, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.