## LOUISVILLE & NASHVILLE RAILROAD COMPANY v. A. J. HARDIMAN.

Middle Section.   July 16, 1927.

No petition for Certiorari was filed.

1. **Railroads. Contract for furnishing cars on a day certain is invalid as discriminating among shippers.**

   In an action to recover damages for the failure to furnish railroad cars on a day certain held that such a contract was invalid even as to intra-shipments because it was a discrimination among shippers which was prohibited by law.

2. **Railroads. Where a regulation of carriers is established by law the right of private contract ceases to exist.**

   Contracts made by shipper with carriers are governed strictly by the provisions of the regulatory laws, and when they are in derogation therof, they are unenforcible. The property of a carrier is charged with a public interest and its business is subject to governmental control within constitutional limitations. No contract can properly be carried into effect which was originally made contrary to law. No right of action exists for the breach of an unlawful agreement.

3. **Railroads. Making of a contract to provide a shipper with cars on a day certain is in violation of Inter-State Commerce Commission rules.**

   The rules of the Inter-State Commerce Commission make it unlawful for a railroad to contract to furnish cars to a shipper on a day certain and such a contract made by the railroad is void.

4. **Railroads. Estoppel. A common carrier cannot be estopped to assert illegality of a contract made in violation of statutes.**

In an action to recover damages for the breach of a contract to furnish cars on a day certain where it was sought to hold the railroad in estoppel, held that the railroad cannot be estopped to assert the illegality of a contract made in violation of the statute for the reason that an estoppel cannot be founded on an illegal act.

Appeal in Error from Circuit Court, Giles County; Hon. W. B. Turner, Judge.

Reversed and dismissed.

Eslick & Eslick, of Pulaski, for plaintiff in error.

R. E. Lee, of Pulaski, for defendant in error.

DeWITT, J.   The plaintiff in this action has recovered a judgment against the Railroad Company for $762.50, for breach of a contract alleged to have been entered into on June 29, 1920, for the furnishing and placing at a station called Frankewing, Tennessee two box cars on July 6, 1920, for shipment by plaintiff of lumber from that station to Nashville, Tennessee.   Two questions are presented for review: first, was the special contract relied upon by defendant in error regularly entered into by plaintiff in error through an authorized agent?   Second, if such contract was so entered into, was it valid and binding upon the railroad company?   A negative answer to either of these questions would obviously be determinative of the case, and a reversal of the judgment would result.

Although it is earnestly insisted that the testimony of the plaintiff himself, especially upon his cross-examination, fails to establish a special contract for the furnishing and placing of the two cars on the day, or days certain, there is evidence to sustain the findings that the plaintiff had a contract with Hunt, Washington & Smith, of Nashville, to sell and ship to them not later than July 15, 1920, certain lumber at the high prices then prevailing; that a portion of this lumber was so shipped; that on June 29, 1920, plaintiff interviewed the station agent of the railroad company at Frankewing, showed him his said contract in writing, told him that he wished to engage two box cars to be placed at Frankewing on July 6th to be loaded with the balance of the lumber so that it could be shipped by July 15th; that the station agent told him that he would try, or do his best, to obtain the cars; that the agent called the train dispatcher at Nashville by telephone, informed him of this request for cars, and at the close of that conversation told the plaintiff that he would get the cars at the time stated; that thereafter he told him several times that he would be sure to get the cars; that the plaintiff had told the agent also that if he did not get the cars so as to ship the lumber within the time limited by the contract, he

would suffer a serious loss; that the agent told plaintiff that a car shortage existed, but as aforesaid, assured him that he would get the cars; that plaintiff completed the sawing of the lumber, delivered and stacked it by the railroad at Frankewing for loading upon cars; and that in the conversation by telephone the agent explained to the train dispatcher the terms of the contract between plaintiff and Hunt, Washington & Smith. The cars were not furnished until July 20th. The prices of lumber were rapidly falling and Hunt, Washington & Smith refused to accept the lumber because it was not delivered within the time specified in the contract. The plaintiff thereupon, after exercising much diligence, sold the lumber at a much lower price then current, and brought this action to recover the amount of the loss which he had sustained by reason of his inability to deliver the lumber under his contract.

A shortage of box cars suitable for such purposes existed in June and July, 1920. The property of the railroad company had but lately been turned back to it by the United States Government. A large number of cars were so disabled and in need of repairs that although they were on sidings not far from Frankewing, they were not in suitable condition for use for the shipment of lumber. An unusual demand existed for freight cars for what are called ''seasonal purposes,'' for grain, produce, live stock and other perishable property, and for phosphate. The railroad company was unable to supply the demand for box cars. The distribution of freight cars was being made under rules and specific regulations of the Interstate Commerce Commission through the Car Service Division of the American Railway Association, acting as the agent of said commission. On June 3, 1920, the chairman of this Car Service Division instructed the railroad company that box cars that would pass inspection for grain loading must not be used for loading of miscellaneous commodities that did not require high-class cars. The instructions were to give preference, in furnishing cars, for shipment of the aforesaid kinds of commodities other than lumber. It was impossible for the carrier to supply all the demand for box cars, and sometimes the supply amounted to little more than ten per cent of the amount demanded. Any contract for the placing of cars on any specified day was not authorized by the carrier and contrary to the regulations of the Interstate Commerce Commission.

Assuming that such contract for furnishing cars on a day certain would have been lawful, we are of the opinion that it was within the apparent scope of the authority of the station agent to bind the carrier by making such agreement. Clark v. Ulster & D. R. Co., 189 N. Y., 93, 81 N. E., 766, 13 L. R. A. (N. S.), 164. But we are also of the opinion that such contract, especially under the said conditions then existing was invalid, even as to an intrastate

shipment, as making discrimination among shippers, contrary to law for the following reasons:

(1)   Sec. 17 of chap. 10 of the Acts of 1897, Shannon's Code, sec. 3059a42, pertaining to common carriers, is as follows:

> "It shall be unlawful for any corporation to make or give any undue or unreasonable preference or advantage to any particular person or locality, or any particular description of traffic, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage."

Sec. 15 of said Act, Shannon's Code, sec. 3059a40, provides that if common carriers make any preference among the parties served by it, in furnishing cars, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared unlawful.

In New River Lbr. Co. v. Tennessee Railway Co., 145 Tenn., 266, 238 S. W., 867, referring to this statute it was said:

> "Our statute was modeled after the Federal Act of February 4, 1887 (24 Stat., 379). That statute was supplemented by others, notably the Elkins Act of 1903 (U. S. Comp. St., secs. 8597, 8585 and 8599), which made the original law more explicit and made shippers criminally responsible for its violation. The general purpose of the first Interstate Commerce Act of 1887, identical with the general purpose in our Act of 1897, has all the while been preserved in congressional legislation, and practically all the decisions upon the construction of the Federal statutes are authoritative upon the construction of ours."

The public policy embodied in such acts was explained by the Supreme Court of the United States as follows:

> "It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equity of rights as to all, and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departure from such tariffs, and forbidding rebates, preference and all other forms of undue discrimination." N. Y. N. H. & H. R. Co. v. Interstate Commerce Commission, 200 U. S., 361, 50 L. Ed., 515.

In Davis v. Cornwell, 264 U. S., 560, 68 L. Ed., 848, it was definitely ruled that under the provisions of the Interstate Commerce Act that tariff provisions must be strictly adhered to, any contract by a railroad company to provide a shipper with cars for loading on a day certain, is invalid; that it is not necessary to prove that a preference resulted in fact; that the assumption by the car-

rier of the additional obligation is necessarily a preference. See also Chicago & A. R. Co. v. Kirby, 225 U. S., 155, 56 L. Ed., 1033, Ann. Cas., 1914a501. The question was passed on whether a carrier can make a contract which may not be avoided by a showing of due diligence on its part. The holding was squarely made that an express provision for delivering a car for loading on a particular day cannot be enforced, because it is a special privilege. The enforcement of such a contract would be in collision with the Interstate Commerce Act, which seeks to enforce tariff provisions and provide equal treatment for all shippers. Either the contract or the act must give way. If railroads were excused from following the provisions of the Commerce Acts by contracts made by them in violation thereof, the acts would have little force in enforcing tariff provisions and equal opportunity for all shippers. Marketing Association v. R. R. Co., 232 Mich., 538, 205 N. W., 477.

Where a regulation of carriers is established by law, the right of private contract ceases to exist. Contracts made by shippers with carriers are governed strictly by the provisions of the regulatory laws, and when they are in derogation thereof, they are unenforceable. The property of a carrier is charged with a public interest and its business is subject to governmental control within constitutional limitations. No contract can properly be carried into effect which was originally made contrary to law. No right of action exists for the breach of an unlawful agreement. New River Lbr. Co. v. Tennessee Railway Co., supra; Cantrell v. Ring, 125 Tenn., 472, 145 S. W., 166. If doubt is thrown upon the existence of a legal contract, specific performance thereof will not be enforced. Morrison v. Searight, 4 Baxt., 476.

Applying the rule that the decisions upon the construction of the Federal statutes regulating railroads are authoritative upon the construction of ours, the application of our statute must be consistent with the rigid rule laid down in Davis v. Cornwell, supra, and other cases. The prohibitions of our statute against preference or discrimination are as explicit and as mandatory as those of the Interstate Commerce Acts. The language of our statute is so similar to that of the Federal statutes that there can be no doubt that the meaning is essentially the same. The public policy of the State of Tennessee in treating shippers alike, in forbidding discrimination, is as clearly set forth as that of the Federal government in the acts of Congress.

As late as 1922, in Southern Railway Co. v. Shipley, 147 Tenn., 40, 245 S. W., 524, the Supreme Court of Tennessee upheld the former rule, that where a railroad company undertakes by contract to furnish a car at a specified time, it is bound to perform this contract and for a breach thereof the shipper is entitled to recover

all damages which naturally and proximately result—citing among other cases, Railroad v. Pounders, 4 Hig. (Tenn. C. C. A.), 372. The court held that this rule of liability applied to a contract for interstate shipment, but in Tennessee Egg Co. v. N. C. & St. L. Railway, 150 Tenn., 540, 266 S. W., 106, so much of the opinion in the Shipley case as sanctioned this idea was disapproved; and upon the authority of Davis v. Cornwell, supra, it was held that a railroad cannot make a valid contract to deliver a car for interstate shipment to a shipper on a certain date. In the Pounders case, decided by the Court of Civil Appeals in 1913 (writ of certiorari being denied by the Supreme Court), an action of this character as to an interstate shipment was sustained. Thus these decisions involving interstate shipments are overruled by the Supreme Court in, Tennessee Egg Co. v. N. C. & St. L. Railway; and in the opinion, although an interstate shipment was solely involved, the court said:

> "In this connection, inasmuch as the Tennessee statutes regulating railroads are patterned after the Federal Acts regulating carriers, it would perhaps not be amiss for us to express a doubt upon a consideration, as to whether a contract by a railroad company to furnish a car on a day fixed, for intrastate transportation, would be valid under existing tariffs."

In view of the provisions of our statute, expressing the public policy of the State, we not only have this serious doubt, but we must resolve it against the validity of the contract, in harmony with the rigid application by the Federal Supreme Court of the almost identical provisions of the Acts of Congress.

(2)   The making of a contract to provide a shipper with cars for loading on a day certain for an intrastate shipment, would, especially under the circumstances shown in the record before us, be an unlawful interference with the regulation of interstate commerce.   In Railroad Commission of Wisconsin et al. v. C. B. & Q. R. Co., 257 U. S., 563, 66 L. Ed., 371, 22 A. L. R., 1086, it was held that in developing interstate commerce agencies, congress can impose any reasonable condition on the State's use of interstate carriers for intrastate commerce that it deems necessary or desirable. The power of congress to regulate interstate commerce, necessarily extending to the instrumentalities of interstate commerce, must of necessity extend to all relations which have a direct bearing upon the ability of the instrumentality to survive and function.   There is essential unity in interstate and intrastate transportation performed by a common agency.   Wilson v. New, 243 U. S., 332, 61 L. Ed., 755; U. S. v. Ferger, 250 U. S., 199, 203, 63 L. Ed., 936, 940, 39 Sup. Ct. Rep., 445; First National Bank v. Fellows, 244 U. S., 416, 426, 61 L. Ed., 1233, 1240, L. R. A., 1918C., 283, 37 Sup. Ct. Rep., 734, Ann. Cas., 1918D, 1169; Northern P. R. Co. v. N. Dak., 250 U. S., 135, 63

L. Ed., 897, P. U. R. 1919D, 705, 39 Sup. Ct. Rep., 502, 18 N. C. C. A., 878.

Sections 15, 16 and 17 of the Federal Transportation Act of 1920 conferred upon the Interstate Commerce Commission full authority to make just and reasonable directions to carriers with respect to car service during any shortage of equipment, congestion of traffic, or other emergency requiring immediate action in order to promote the services of the carriers in the interest of the public and the commerce of the people. It was empowered to make such directions through and by such agents or agencies as the commission should designate and appoint for that purpose. It was made the duty of all carriers by railroad, their officers, agents and employees, to obey strictly and conform promptly to such orders or directions of the commission. It was further provided that nothing in this act should impair or affect the right of a State in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except insofar as such requirement is inconsistent with any lawful order of the commission, made under the provisions of the act.

It is clear that the orders and regulations of the Car Service Division, as the agent of the Interstate Commerce Commission, applying to an emergency of car shortage in June and July, 1920, were made under lawful authority, and that the railroad company had no power to disregard the same. It is also clear that the making and execution of a contract by a shipper for cars to be placed on a certain day, would operate as a preference to one not in the preferred class of shippers, and as an interference with the directions of the Interstate Commerce Commission through its lawful agents, that cars be furnished preferably for transportation of commodities other than lumber, and that they be furnished in the order in which they would be available.

The insistence made that the railroad company is estopped to rely on the invalidity of the contract cannot be sustained. In many cases, especially in action to recover lawful rates different from rates agreed upon, this question has been raised and it has been uniformly held that the carrier cannot be estopped to assert the illegality of a contract made in violation of the statute, for the reason that an estoppel cannot be founded on an illegal act. 10 C. J., 511; C. C. C. & St. L. Railway Co. v. Coal & Coke Co., 147 Tenn., 433, 248 S. W., 299.

For these reasons we are of the opinion that the Circuit Judge was in error in sustaining the contract sued on, and in awarding judgment for damages. The judgment is reversed. As the trial was before the Circuit Judge sitting without the intervention of a jury, the suit is dismissed. The costs of the appeal will be ad-

judged against the trustee in bankruptcy of the defendant in error. The costs incurred in the court below will be adjudged against said trustee in bankruptcy and the surety on the original cost bond of said defendant in error, to the extent in the progress of the action that he was liable on said bond.

Faw, P. J., and Crownover, J., concur.