Heylandt Sales Co. *v.* Welding Gas Products Co. *et al.*

(*Knoxville*, September Term, 1943.)

Opinion filed November 20, 1943.

WILLIAMS & FRIERSON, of Chattanooga, for complainant.

Jac Chambliss, W. G. Brown, and R. N. Chambliss, all of Chattanooga (Sizer, Chambliss & Kefauver, of Chattanooga, of counsel), for defendants.

Mr. Justice Gailor delivered the opinion of the Court.

Complainant, a stockholder of defendant corporation, sued to cancel an issue to individual defendants of 580 shares of the corporate stock of defendant corporation, charging that complainant had been denied participation in this new issue, in violation of a right reserved by the by-laws and the statute. Code 1932, section 3734. The answer admitted this, but charged that the complainant had theretofore violated agreements made with defendants upon the organization of defendant corporation; that complainant had agreed not to acquire a majority of stock in defendant corporation nor to secure control thereof; that contrary to its solemn agreement complainant had acquired such control; that complainant was not therefore entitled to participate in the additional issue, which would only increase and confirm the control, theretofore unfairly and inequitably secured; finally that in view of its violation of this agreement, complainant could not maintain its suit in a court of equity, whence it would be repelled under the doctrine of unclean hands. The Court of Appeals, reversing the chancellor, so held with defendants and dismissed the suit. This court granted *certiorari,* the two courts having differed and the questions being important, and argument has been heard.

A brief statement of the history of the case and relationship and respective interests of the parties is pertinent. Complainant is a foreign corporation, a subsidiary of the National Cylinder Gas Company and wholly

ownned by it. Defendant Welding Gas Company is a local corporation. Both are engaged in the production and distribution of oxygen acetylene gas. The individual defendants are officers, directors and stockholders of defendant Welding Gas Products Company.

The opinion in this case delivered by the Court of Appeals fairly sets out the relation of the parties:

"At the time of the organization of defendant corporation the Compressed Industrial Gases Company was doing the bulk of this business in the Chattanooga territory. Among the rivals of C. I. G. was the National Cylinder Gas Company. These large companies had an understanding that they would not compete with each other for this business, yet the N. C. G. C. was anxious to get into the Chattanooga territory. This being true, one Heppel, a vice president of the complainant corporation, as well as a vice president of N. C. G. C., became interested in aiding the defendants herein to organize their corporation. The complainant corporation is owned by Heppel and one other stockholder of the N. C. G. C. For all intents and purposes it is merely organized for a blind to do what the N. C. G. C. cannot do itself. The acts of complainant corporation, in so far as this record is concerned, are the acts of N. C. G. C. . . . At the outset it was agreed that the individual defendants would sell at least $10,000 worth of stock, and Heppel and his associates would assist the defendant corporation by purchases of stock and extension of credit so that the defendant corporation could get started; it being the desire of N. C. G. C., through its vice president, Heppel, to furnish competition to C. I. G. The individual defendants, fearing that N. C. G. C. would swallow them, agreed with Heppel that N. C. G. C. was never to acquire more than forty-six (46) per cent of its stock. The ma-

jority of the stock was to be held by those independent of N. C. G. C. . . . As the defendant corporation progressed it issued 1,320 shares of its capital stock without protest and with consent of its stockholders and at the direction of its directors. This stock was issued for cash and in payment of its obligations. A large amount of this stock was issued to complainant in payment for equipment sold the defendant corporation by N. C. G. C. Through subscriptions for stock by Heppel, taken in his mother-in-law's name, for stock purchased by Heppel from individual defendants, and for equipment, the complainant eventually acquired 786 shares out of 1320 shares outstanding as of December 23, 1940. The defendant issued 100 shares in addition to above in payment of indebtedness. This left 580 shares of the authorized 2000 shares. These were issued the individual defendants in December, 1940, and early in 1941. These shares were issued with consent of all stockholders except the complainant. It is this act of the defendants that is complained of in this lawsuit. Sometime between the organization of the defendant corporation and the time of issuance of the 580 shares the N. C. G. C. had taken over the C. I. G. and thus became a competitor in the Chattanooga area with the defendant corporation. After learning that the N. C. G. C. had taken over its rival and was competing with it and had the majority of the outstanding stock, the defendants had issued to them the 580 shares. . . . The evidence is uncontradicted that the complainant through Heppel agreed that it would not acquire over 46 per cent of the defendants' stock; i. e., that N. C. G. C. would not acquire over this amount. Contrary to this agreement the complainant continued studiously to acquire the stock of the defendant corporation until it finally owned 958 shares

of a possible 2000 shares. These shares were acquired in payment of indebtedness and for cash. Some were purchased from some of the individual defendants through glowing promises of a glorious future which later turned out to be untrue. The only inference to be drawn from this record is that the complainant started out with the idea that it would, contrary to its agreement, control this corporation. This purpose and intention evidently ripened after the complainant became the only competitor of the defendant corporation. These acts were so clearly connected that we feel this is certainly a case where the maxim 'He who comes into Equity must come with clean hands' should be applied.''

The chancellor was of opinion that, by acquiescing in the acquisition by complainant of shares giving it a majority, and permitting transfer of these shares on the corporate books, the defendants had waived their right to rely on the agreement. The Court of Appeals considered and rejected this view, holding that the course of conduct of defendants in this regard lacked elements of understanding and intention essential to the doctrine of waiver, citing and quoting authorities.

It is insisted for petitioner here that the doctrine of unclean hands does not apply because the alleged misconduct of complainant, and those it represents, was not closely enough related to the transaction challenged by the bill; that the two alleged wrongs were independent and disconnected and, therefore, the doctrine of unclean hands is inapplicable.

We agree, however, with the Court of Appeals that the two matters are causally connected; the one being the cause of which the other is the result. The issue and purchase by defendants of treasury stock was made only to avoid the consequences of the repudiation

by complainant of its original agreement. The bill seeks to prevent defendants from protecting themselves from the damaging effect of the wrong perpetrated on them by complainant touching the very matter in issue between them, the control of the defendant corporation by ownership of a majority of the corporate stock. "A promoter who, in violation of subscription agreements, has obtained control of a corporation, may not complain in equity that such control has been taken away from him through sales of stock by the directors of the corporation." Pomeroy's Equity Jurisprudence (5th Ed.), sec. 402 (c). And it is not only "fraud or illegality which will prevent a suitor from entering a court of equity.; any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience;" (ibid. sec. 404) that in such a situation the maxim of unclean hands applies.

██ Moreover, while it is true that the by-laws of the corporation and the statute reserve to the stockholder complainant the pre-emptive right to participate *pro rata* in additional stock issues, when complainant agreed that it would never acquire a majority of the shares, did it not waive this pre-emptive right if and whenever the exercise of the right would contravene this agreement. If so, then equity may not be invoked as against this waiver, upon which defendants relied for their protection. *Baird v. Fidelity-Phenix Fire Insurance Co.,* 178 Tenn., 653, 664, 665, 162 S. W. (2d), 384, 140 A. L. R., 1226. Whether the principle of equity invoked be that of unclean hands, or estoppel by waiver—the result is the same and this bill cannot be maintained.

While the original agreement provided for the stock to be so distributed between the two groups that the complainant group was never to hold more than 46 per

cent of the stock outstanding, it developed that at the time the issue of stock complained of by this bill was issued to defendants, the complainant had acquired, by various and sundry means, considerably more than 51%, 958 shares out of a total of 1420 shares outstanding. The issue to defendants of the 580 shares challenged by the bill gave to the defendant group a total of 1042 shares, thus reinstating this group as majority holders in approximately the ratio fixed by the original plan and agreement. Of the situation thus resulting, how can complainant reasonably and justly complain?

Conceding the irregularities alleged in the issue of this stock, the disregard by the one group of its agreement and by the other of the pre-emption rights, the net result appears fair and just. When the organization of defendant corporation and the terms of distribution of its capital stock were agreed upon between these two groups, the authorized capital stock was fixed at 2,000 shares, and the ratio of holdings at 46 and 54 per centum respectively. Now, as above shown, upon the filing of this bill, the stock was distributed approximately in the proportion that had been originally contemplated and agreed upon by the parties. No wrong has resulted which equity may be called upon to right.

Counsel for petitioner say that, even if complainant did agree not to acquire control by majority stock ownership of the Welding Gas Company, and did thereafter do so, this was with the acquiescence and co-operation of defendants and that there is no evidence of an effort or design to wrong defendants, no showing of bad faith so as to call for application of the doctrine of unclean hands. But, even if petitioner be relieved of the charge of bad faith, how can it be said that equity demands cancellation of the shares of stock taken over by defendants to re-

capture that very majority stock control which petitioner and associates solemnly agreed they should be permitted to possess?

We do not think the petitioner may here successfully question the fact, which the Court of Appeals refers to as "uncontradicted," that the agreement for the controlling ownership of the stock was made. While the chancellor did not so directly find this fact as to provide us with a concurrent finding, his disposition of the case makes the conclusion inescapable that he found the agreement for the proportionate ownership of the stock and the resulting control of the corporation, to have been made as the defendants contend.

In the concluding pages of the able opinion of the Court of Appeals, by Judge Burnett, the authorities bearing on the two questions of law involved are so aptly and fully reviewed and applied that we can do no better than quote approvingly therefrom:

"In the 4th Edition of Gibson's Suits in Chancery, section 42, in speaking of the maxim 'He who comes into Equity must come with clean hands' it is said:

" 'In the origin of the jurisprudence, the theory was adopted that a Court of Equity interposed only to enforce the requirements of good conscience and good reason, as to matters not equitably determinable in the Law Courts; and this interposition being deemed a matter of Grace, it would not be exercised in favor of a person, whose conduct, in the matter he had complained of, had been unconscientious, or in bad faith; or who had violated any of those principles of Equity and righteous dealing, which the court had been constituted to enforce. But the operation of the maxim is confined to misconduct connected with the particular matter in litigation;' (and see section 285 of same work).

"This maxim is fully discussed and ably analyzed in Vol. 2 of Fifth Edition of Pomeroy's Equity Jurisprudence, section IV, beginning at page 90. The cases on the subject are too numerous to attempt to cite or analyze. The Supreme Court of this State in *Overton* v. *Lewis,* 152 Tenn., 500, beginning at page 507 [279 S. W., 801, beginning at page 803] reviews a number of these cases and very aptly sets forth wherein the maxim is applicable.

"The specific question here raised was passed upon in *Reese et al.* v. *Huron Grain & Coal Co. et al.* (1939), 67 S. D., 9, 287 N. W., 640 and it was held that:

"'Evidence justified trial court in finding that purchase of stock by plaintiff to gain control of a corporation was an act of bad faith, in violation of an agreement with board of directors, at time plaintiff was negotiating a loan to board, that he wanted some stock to insure continuance of the management until the loan was paid and that he did not want control of the corporation or a majority of the stock, and trial court properly refused to oust directors and install plaintiff and other stockholders in their places on ground that plaintiff was in court with unclean hands.'

"It is urged by the complainant in reference to agreement that N. C. G. C. would not acquire control that 'if there had been such an agreement it was waived when the directors consented to the issuance of a majority of the shares to complainant.'

"In Vol. 44 of Words and Phrases at page 518 a 'waiver' is defined to be 'an intentional relinquishment of a known right, which may be manifested by word of mouth, or by such acts and conduct as would naturally give rise to an inference that a waiver is intended; and there is no waiver unless the intention to waive is understood by the party to be benefited, or where one

party has misled the other, or unless the act relied on ought in equity to estop the party from denying it.' And 'Waiver is the voluntary abandonment or surrender by a capable person, or a right known by him to exist, with intent that such right shall be surrendered and such person forever deprived of its benefits.'

"In *National Life & Acc. Ins. Co.* v. *Varner,* 171 Tenn., 95, 101 [100 S. W. (2d), 662], Mr. Justice McKinney quotes with approval the following statement:

"'Waiver is the intentional abandonment of a known right, not a trick to catch one napping.'

"The parties to this litigation did not waive their rights herein. They were repeatedly led to believe by Heppel that his shares would be voted with the independents and not N. C. G. C.

"'Under this Maxim (unclean hands) any wilful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fairminded men, will be sufficient to make the hands of the applicant unclean.' Pomeroy's Equity Jurisprudence, Fifth Edition, section 404.

"'Having found the complainant guilty of overreaching the defendants and of misrepresentation it is in court with unclean hands and must be repelled."

The decree of the Court is affirmed.

Chambliss, J., did not participate.