Jacquelyn Ann O'BRIEN,
Plaintiff/Appellee,

v.

Gerald Joseph O'BRIEN,
Defendant/Appellant,

v.

Sara HICKLEN, Third Party
Defendant/Appellee.

Court of Appeals of Tennessee,
Middle Section.

May 6, 1987.

Certiorari Denied by Supreme Court
July 27, 1987.

Patrick J. McHale, Murfreesboro, for defendant/appellant.

Richard Buerger, Franklin, for plaintiff/appellee.

## OPINION

TODD, Presiding Judge.

This is a divorce case in which there is no complaint as to the adjudication of the issues between the original parties, but the defendant, Gerald Joseph O'Brien has appealed from that portion of the judgment which dismissed his third party complaint against the third party defendant, Sara Hicklen, seeking an equitable lien and/or constructive trust in respect to a home and surrounding 10 acre tract owned by the third party defendant.

For clarity and brevity, the parties to this appeal will be referred to herein as Mr. O'Brien and Mrs. Hicklen.

The only issue presented on appeal is whether the Trial Court erred in dismissing Mr. O'Brien's third party complaint which alleged:

I. That SARA HICKLEN is a resident of Route 2, Box 105, Nolensville, Tennessee 37135, and she is the mother of JACQUELYN ANN O'BRIEN and in-law of GERALD JOSEPH O'BRIEN. She has legal title to a house and acreage which is the subject of this litigation. A copy of the deed is attached hereto as Exhibit "A."

II. Ten (10) acres of land was given to GERALD JOSEPH O'BRIEN and JACQUELYN ANN O'BRIEN, and a house was built. A $32,000.00 loan was obtained from the Federal Land Bank in the name of MR. AND MRS. A.B. HICKLEN. They made one payment as a gift to JACQUELYN AND GERALD O'BRIEN in April, 1985. Later, the Land Bank loan was paid off from $13,000.00 of JACQUELYN AND GERALD O'BRIEN'S funds and $18,000.00 from SARA HICKLEN'S funds.

III. Then MR. AND MRS. O'BRIEN built a garage at a cost of $7,000.00. A fireplace also cost $1,000.00.

IV. Insurance money from MR. O'BRIEN'S stolen gun collection was then spent for a burglar alarm and repainting the house.

V. MR. AND MRS. O'BRIEN have made all other payments on the house, and the house has a fair market value of at least $70,000.00 exclusive of the land.

VI. That MR. AND MRS. O'BRIENS' earnings since the marriage in 1981 have been invested in the house.

VII. That the Court should create an equitable lien and a constructive trust on behalf of GERALD JOSEPH O'BRIEN and determine his interest in the house and acreage, declare a lien and award a

money judgment against SARAH HICK-LEN.

Mr. and Mrs. O'Brien were married on February 14, 1981. Mrs. Hicklen, the mother of Mrs. O'Brien owned a 36 acre tract containing the home where Mr. and Mrs. Hicklen resided.

Prior to the marriage of Mr. and Mrs. O'Brien, her parents had discussed the idea of building a second house on the 36 acre tract because they had two children, Mrs. O'Brien and a brother, and they (the parents) wished to leave each of their children a house.

Promptly after the marriage, it was determined that the second house should be built. There is little or no controversy about the understanding or basis upon which house was to be built and used. The evidence of such understanding is found in the testimony of Mrs. O'Brien, Mr. O'Brien and Mrs. O'Brien's father, Mr. Hicklen. Mrs. Hicklen did not testify, and it appears that Mr. Hicklen spoke for her in the discussion.

Mrs. O'Brien's testimony on the subject is as follows:

Q. Were you going to own this property at some time in the future?

A. I will, at their death, you know.

Q. Do you have any other relatives?

A. I have a brother, an older brother.

Q. What is the family plan as to what's going to happen to your mother's acreage?

A. We have it divided off where the half of the property where the house is built will be deeded to me, and the other half will go to my brother.

. . . .

A. Even before I even met Gerry, I had discussed on different occasions with my mom and dad that if we could see through to discuss about building a house, because, you know, I was getting a little older and more responsible and didn't want to have to keep paying apartment rent for the rest of my life. We had discussed on lots of occasions about building a house out there. And then Gerry and I married, and even before we

married, we were kind of looking out there and we talked. So, we married and they said, well we'll build this house out here and y'all are free to live in it, to have use of the property at your access at any time to do with whatever you want, for as long as we chose to live in the house, to make payments on it, of course, while we're living there. And that's just pretty much the way it was done. So, my dad saw contractors and got the house built.

. . . .

Q. During the time the house was being constructed, was it your intention to live there as a married couple?

A. Yes, sir.

Q. And you did, in fact, live there as a married couple until the separation in June of 1985. Is that correct?

A. Yes, sir.

. . . .

Q. During your direct testimony, you talked about an arrangement wherein your parents would give you back money as a result of their depreciating the house for their federal income tax purposes. Is that correct?

A. Yes, sir.

Q. Was that by agreement or arrangement between and among you and Gerry, and your parents?

A. Well, it was—like I said, it was a gift from them because they realized we did not get to claim any of the interest on the money we paid on the house, so this was more or less their gift back to us, because they were deducting the house from their taxes, and we were living there. So, this was just a gift back from them.

Mr. O'Brien's testimony on the subject is as follows:

Q. What is your recollection, if any, about the plans to build a residence on the Sarah Hicklen thirty-six acre tract located here in Williamson County, Tennessee?

A. Mr. and Mrs. Hicklen, and Jackie and I discussed the building of the house shortly after we were married. And Mr. and Mrs. Hicklen told me that they were

willing to obtain a loan and—for us, and that we were to build a house out there, and they were going to keep the home in their name because they would depreciate it—the interest off their taxes. And then in turn, they would give us whatever money that they depreciated off their taxes for it. They would give that back to us. And we agreed that I would get more money back that way than if I deducted the depreciation off the house, off the taxes.

Q. Was that satisfactory to you?

A. Yes, sir.

. . . .

Q. During the time that you were building the house, did you consider yourself happily married?

A. Yes, sir.

Q. Did you anticipate that you would be living in this house?

A. Yes, sir.

Q. Did you anticipate that you would be there for some time?

A. The rest of my life.

Q. Did you have any reason to know that you wouldn't be there for an indefinite period?

A. No, sir.

. . . .

THE COURT: Let me ask a question or two. Did you and your wife—while you were living there, did you have the use of the whole ten acres that went with that?

THE WITNESS: Yes, sir. What we had was—Mr. and Mrs. Hicklen didn't want to split the land up. They wanted to keep it all in one farm. This way the house was there, and they could depreciate the house on the farm, so that if they—

. . . .

THE COURT: Did you leave, or did she kick you out, or was it mutual parting?

THE WITNESS: I left, sir.

Mr. Hicklen's testimony on the subject is as follows:

A. Well, even before they married, we discussed building a house for my daughter back there, and for tax purposes, too. In case I needed help, I'd have somebody there to let them work out part of the rent on the place. And after they married, they come out and wanted to know if they could build a house. So I told them, I said, well, if you all want a house, we'll go back here, but the house has got to be on the lower half of the place, because I don't want two houses on the same half.

Q. What was the reason for that?

A. Well, because of our son—we've got a boy and a girl, so we wanted to be sure that the houses were on either half of the place. So, we looked at it and we found this particular place down there on Rocky Glade, that nothing else wouldn't grow. And they said that's where they wanted to put the house. So, I told them, I said, now, the house we'll put it here, but I want one thing clearly understood. The place is not in my name. I can't give you nothing. I can't give you authority for nothing. But as long as my wife lives, or as long as I live, there won't ever be any changes in the deed to the property, because our children will—we've got it willed to our children, and whatever they do with it, that's their business after we're gone.

Q. That was as far as the legal title was concerned?

A. That's right, legal title. That's right.

The foregoing is all of the evidence found in the record reflecting upon the intentions and expectations of the parties in respect to Mr. O'Brien's interest in or expectations from the construction of the house in question.

There is no evidence of any direct interest, legal or equitable, of Mr. O'Brien in the house, except evidence that he did have a reasonable expectation of residing in the house with his wife until the death of her parents and of the ownership of the house by his wife thereafter.

If Mr. O'Brien had been excluded from realizing the benefit just stated through no fault of his own, there would be an arguable basis for granting to him some form of equitable relief. However, this is not what occurred. As disclosed by Mr. O'Brien,

above, he was not "kicked out of the house"; he left.

Moreover, the termination of his marital relationship with Mrs. O'Brien was, by uncontradicted testimony of Mrs. O'Brien, partly admitted by Mr. O'Brien, and by the finding of the Trial Judge, due solely to the misconduct of Mr. O'Brien.

Where Mr. O'Brien abandoned the one benefit he expected to derive from his participation in building the house, (joint occupancy with wife) he can hardly be heard to demand an alternative benefit (cash) which was never within the contemplation of the parties as a result of his abandonment of occupancy and misconduct producing the divorce.

Furthermore, Mr. O'Brien is precluded from seeking equitable relief under the circumstances by the maxim of equity,

He who comes into equity must do so with clean hands.

Gibson's Suits in Chancery, Sixth Edition § 18, pp. 20, 21. The application of this maxim to the present case is that the right claimed by Mr. O'Brien (to a cash payment for an equitable interest) is predicated upon the destruction of his real expectation (to live on the property with his wife) by his own misconduct. It is not suggested that Mr. O'Brien deliberately misbehaved, broke-up his marriage and left the home in order to create a right to collect money from Mrs. Hicklen; but it is unquestionably true that, if this conduct had not occurred, Mr. O'Brien would still be enjoying his expected benefit of living in the house with his wife. Thus, the wrongful conduct of Mr. O'Brien is the necessary foundation upon which his present claim against Mrs. Hinklen must stand or fall. It is a wrongful foundation, hence his claim in equity must fall.

■ This Court therefore concludes that, because of his abandonment of his wife and home, Mr. O'Brien has waived his expectation of continued residence in the home, and, because his equitable claim to an alternative benefit of cash compensation is based upon his own misconduct, his claim is not enforceable in equity.

See *Heylandt Sales Co. v. Welding Gas Products Co.*, 180 Tenn. 437, 175 S.W.2d 557 (1943). *New River Lumber Co. v. Tenn. Ry Co.* 145 Tenn. 266, 238 S.W. 867 (1922); *Seaton v. Dye*, 37 Tenn.App. 323, 263 S.W.2d 544 (1953).

The Chancellor approached the issue from a different viewpoint: the amount of contribution of Mr. and Mrs. O'Brien to the construction and improvement of the house compared to the benefits received. The testimony in this respect is not entirely harmonious, and there is uncertainty by the parties as to the specifics of amounts and sources of cash contributions. Mr. O'Brien contributed some labor in the construction, the amount of which is disputed. Part of the construction loan was paid by Mrs. O'Brien out of funds partly furnished by Mr. O'Brien, but the amount furnished by him is disputed. Some of the funds were "strawberry money" which Mr. O'Brien claims was his share of profits from a strawberry patch which he helped Mr. Hicklen tend. Mr. Hicklen insists there were no profits, that he paid Mr. O'Brien a sum in settlement of any claims for strawberry profits, and the "strawberry money" was in fact a gift from Mr. and Mrs. Hicklen to Mrs. O'Brien. After considering all of the evidence, the Chancellor concluded that the amounts of the contributions of Mr. and Mrs. O'Brien to the construction and improvement of the house were less than the reasonable value of the occupancy of the house for the period when Mr. and Mrs. O'Brien lived there. The evidence does not preponderate against this finding which is presumed correct. T.R.A.P.Rule 13(d). Therefore, in addition to the reasons heretofore discussed, this Court affirms and adopts the reasoning of the Chancellor.

It is true, as insisted by Mr. O'Brien, that the Hicklens borrowed only $32,000 to build the house; that part of this amount was repaid by funds of Mr. and/or Mrs. O'Brien; that Mr. O'Brien performed some labor in constructing the house; that Mr. and Mrs. O'Brien made certain improvements on the original house at their own expense; and that, after five years, Mrs. Hicklen owned a house worth $60,000.00 to $65,000.00. It is also true that Mr. Hicklen

acted as general contractor in building the house; that he performed a major part of the labor; that the loan was obtained on the credit of Mr. and Mrs. Hinklen; and that, throughout the marriage, the Hinklens were generous in their gifts to Mr. and Mrs. O'Brien.

It is clear and uncontradicted that Mr. O'Brien was never promised any legal interest in the house. His sole expectation was the privilege of occupancy and ultimate ownership by his wife. His contributions to the production and improvement of the house must be considered as contributions to the ultimate ownership of his wife and not to create any enforceable interest in himself.

Mr. O'Brien cites *Gibson, supra,* § 383, to support his insistence that no presumed intention of the parties is required to support a resultant trust. It is insisted that Mr. O'Brien "trusted" Mr. and Mrs. Hinklen, which is sufficient. As heretofore pointed out, Mr. Hinklen's trust was bounded by the express declarations of Mr. Hinklen, and the express testimony of Mr. O'Brien, that is that Mrs. Hinklen would continue to hold title until her death, and thereafter Mr. Hinklen would continue to hold title until his death, during which times the O'Briens were privileged to occupy the house and after which time the house would belong to Mrs. O'Brien. There was an express trust as stated. Its terms have not been violated. There is no occasion for creating an entirely imaginary trust foreign to the actual intention of the parties.

Mr. O'Brien cites *Browder v. Hite,* Tenn. App.1980, 602 S.W.2d 489. In that case, Mr. and Mrs. Browder furnished Mr. and Mrs. Hite $8,000 to purchase property in their own name to enable the Browders to apply for a loan without stating that they owned the $8,000 property. It was expressly agreed that, upon the completion of the loan transaction, the Hites would convey the $8,000 property to the Browders. The Hites conveyed the property to others, but were required to refund the $8,000 to Mrs. Browder, Mr. Browder having died in the meantime. The case is clearly distinguishable from the present case in which no duty, express or implied has been breached by Mrs. Hinklen.

Mr. O'Brien also cites *Fehn v. Schlicking,* 26 Tenn.App. 608, 175 S.W. 37 (1943). In that case, Magdalene Schlicking, who was overseas, sent money to her brother, Albert, to be invested for her. He used the money to build improvements on his own land. This Court affirmed a decree fixing a lien upon the brother's land to enforce an accounting for the money entrusted to him. This was a classic example of circumstances producing a constructive trust. None of such circumstances appear in the present case.

■ Mr. O'Brien relies upon the doctrine of unjust enrichment. It is true that Mr. O'Brien's misconduct and abandonment of his wife and home has left Mrs. Hicklen in possession of a house worth more than her cash investment in it. However, it would be difficult to say that, with recent inflationary trends in the value of real estate, with the receipt of actual rental value of the home for the five years, and with the contribution of Mr. Hicklen to the construction of the house, a similar profitable result could not have been realized without the participation of Mr. and Mrs. O'Brien.

The judgment of the Chancellor is affirmed. Costs of this appeal are taxed against Mr. O'Brien. The cause is remanded to the Trial Court for such further procedure, if any, as may be necessary and proper.

Affirmed and remanded.

LEWIS and KOCH, JJ., concur.